BNSF GENERAL OBJECTIONS
Fed. R. Evid. 804(b)B1)(B)

BNSF OBJECTIONS

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JEANETTE M. WALLIS<br><br>Plaintiff,<br><br>vs.<br><br>BNSF RAILWAY COMPANY, a Delaware corporation<br><br>Defendant. | Case No. 2:08-CV-1711 |

Deposition Upon Oral Examination

of

ELIZABETH ANN JACKSON

Taken at 1218 Third Avenue, 27th Floor
Seattle, Washington

DATE: May 20, 2010

REPORTED BY: Lori K. Haworth, RPR
License No.: 2958

STARKOVICH REPORTING SERVICES
(206) 323-0919

APPEARANCES

For the Plaintiff: WILLIAM G. JUNGBAUER
Yaeger Jungbauer & Barczak, PLC
745 Kasota Avenue
Minneapolis, Minnesota 55414
wjungbauer@yjblaw.com

For the Defendant: TOM MONTGOMERY
Montgomery Scarp MacDougall, PLLC
Seattle Tower, 27th Floor
1218 Third Avenue
Seattle, Washington 98101
tom@montgomeryscarp.com

TERU OLSEN
Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue
Suite 3400
Seattle, Washington 98101-3034
olsen@ryanlaw.com

Also Present: CHUCK HILLYARD
JEANETTE WALLIS

--o0o--

STARKOVICH REPORTING SERVICES
(206) 323-0919

INDEX

EXAMINATION BY: Page
Mr. Jungbauer . . . . . . . . . . . . . . . . . . . . . 4

* * *

EXHIBITS FOR IDENTIFICATION:
Number Page
1 BNSF Northwest Division Safety Action Plan 2008 . . . . . . . . . . . . . . . . . 23

STARKOVICH REPORTING SERVICES
(206) 323-0919

SEATTLE, WASHINGTON; THURSDAY, MAY 20, 2010
9:09 A.M.
--o0o--

ELIZABETH ANN JACKSON, deponent herein, being first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. JUNGBAUER:

Q. Would you please state your full name for the record.
A. Elizabeth Ann Jackson.
Q. And what is your -- where do you live?
A. Spokane, Washington.
Q. What's your address?
A. 2701 East 36th Avenue, Unit A, Spokane, 99223.
Q. What is your position of employment?
A. Terminal manager.
Q. Where?
A. Spokane.
Q. How long have you been the terminal manager at Spokane?
A. Nine months.

Q. Before I go any further, have you ever had your deposition taken before?
A. No.
Q. Have you had a chance to talk to the lawyer, Mr. Montgomery, representing the BNSF about how this works?
A. Yes.
MR. MONTGOMERY: Object to the extent it calls for a response that evokes the attorney-client privilege, the last part of it about how it works.
Q. Sometimes -- okay. I will try to explain some things for you. First of all, we try to be as relaxed as we can in here. The court reporter will be taking down what you say. About the only rules we have is we both can't talk at the same time. Is that understood?
A. You and me?
Q. Yes.
A. Okay.
Q. And secondly, if you don't understand some question -- any question that I ask you, would you please let me know, and I will rephrase it or re-ask it. Is that understood?
A. Yes.
Q. Okay. And of course, if you need a break or whatever, just feel free to ask, and we will try to accommodate you.
A. Okay.
Q. All right? Good. What did you do to prepare for this

Page 6

deposition today?
MR. MONTGOMERY: Objection; assumes facts not in evidence.
Q. Did you review any documents?
A. No.
Q. Are you familiar at all with any of the circumstances of Ms. Wallis's accident?
A. As far as what?
Q. What, if any, information do you have?
A. Regarding the injury --
Q. Yes.
A. -- itself?
Q. Yes.
A. Nothing.
Q. Okay. What do you have information about?
A. I don't have any information regarding --
Q. The accident, itself?
A. -- Jeanette Wallis's accident.
Q. Okay. Prior to being a terminal manager in Spokane, what other job -- what's the most previous job to that, that you had?
A. I was a manager of safety.
Q. For what territory?
A. For the Northwest Division.
Q. What does the Northwest Division of BNSF encompass?

Page 7

A. It encompasses the states of Washington, Oregon, northern California, and part of Idaho.
Q. How long were you the manager of safety of the Northwest Division?
A. Approximately one year eight months.
Q. Were you the manager of safety at the time of Ms. Wallis's accident?
A. Yes.
Q. So safety would have been in -- the territory where she was working would have been under your -- partially under your jurisdiction at that time?
MR. MONTGOMERY: Object to the form.
Q. You can answer.
A. Can you say that again?
Q. Yes. I will ask her to -- and by the way, sometimes when counsel for the railroad objects, unless he instructs you not to answer, you can still and will still answer the questions.
MR. MONTGOMERY: If she can.
Q. If you can. All right?
A. Okay.
Q. All right. So I will ask the court reporter to read back the question.
(The question was read back.)
MR. MONTGOMERY: That's why I objected to the

Page 8

form.
MR. JUNGBAUER: I will rephrase the question.
Q. At the time of Ms. Wallis's accident and injury, the place and location where she was working was part of your safety territory, correct?
MR. MONTGOMERY: Object to the form.
A. Correct.
Q. Okay. And prior to being manager of safety, what, if anything, did you do on the railroad?
A. I was a manager of corridor operations in Fort Worth, Texas.
Q. How long were you a manager of corridor operations?
A. One year six months.
Q. What did you do before that?
A. I was a terminal trainmaster.
Q. Where?
A. Havre, Montana.
Q. How long were you a terminal trainmaster in Havre?
A. One year eight months.
Q. Prior to being a terminal trainmaster, what did you do?
A. Corporate manager -- corporate management trainee.
Q. How long were you a corporate management trainee?
A. One year.
Q. Where did you do that?

Page 9

A. In Billings and Fort Worth.
Q. Prior to being a corporate manager trainee, what were you, if anything, with the railroad?
A. I was not with the railroad.
Q. Okay. What did you do prior to working for the railroad?
A. I went to school.
Q. Where did you go?
A. Texas A&M.
Q. What did you major in? Did you complete a college degree there?
A. Yes.
Q. And what is your degree?
A. Business administration degree.
Q. Okay. When you first went to work for BNSF as a management trainee, did you start in Fort Worth or did you start in Billings?
A. I started in Fort Worth.
Q. And who did you work with there?
MR. MONTGOMERY: Object to the form.
Q. Who was your boss?
A. We were in training, so we worked with a lot of people.
Q. How many people were in your class?
A. I can't remember.

Q. Can you give me a guess?
MR. MONTGOMERY: Don't guess.
Q. Well, your best educated -- if you can tell me now, do you remember any other people in the class? You used the word "we."
A. Yes, there were other people in my class.
Q. Did you have formal classroom training?
MR. MONTGOMERY: Object to the form.
A. What do you mean by "formal classroom training"?
Q. Well, did you ever get any manuals or written materials from the company when you were doing your management training?
A. Yes.
Q. Okay. What types of materials did they give you?
A. I can't remember.
Q. Do you have any of them still? Did you keep your materials?
A. No.
Q. What did you do with them?
A. Between moves from Fort Worth to Billings and other subsequent moves, I don't have them anymore.
Q. Okay. Who did you work with in Billings, Montana?
A. Who did I work with?
Q. Yes.
MR. MONTGOMERY: Are you determined to make this

be a two-hour deposition even though she doesn't really know much about this case?
MR. JUNGBAUER: I have a lot to ask her.
MR. MONTGOMERY: Good. You get to it.
MR. JUNGBAUER: I am trying.
MR. MONTGOMERY: Who did she work with in Billings?
MR. JUNGBAUER: What's that?
MR. MONTGOMERY: It would be nice if you would get to what counts.
MR. JUNGBAUER: We've got two hours until the next witness.
MR. MONTGOMERY: That's my point, Bill. I don't think you need to use the two hours just because she is here.
MR. JUNGBAUER: No, no.
MR. MONTGOMERY: I have stated my position.
Q. All right. Why don't you tell me who you worked with in Billings.
A. I worked with Kelly Duryea (ph).
Q. And who is Kelly?
A. General director of transportation.
Q. Okay. Who else?
A. Anybody that was at their division headquarters.
Q. Did you ever run into Tom Goetz over there? He is a rehab guy.

A. No. I don't believe so.
Q. Did you have anything to do with rehabilitation?
A. No.
Q. Did you have anything to do with safety at that time?
A. No.
Q. What were your job duties as a trainee in Billings?
A. Learning railroad.
MR. MONTGOMERY: What did you say? Oh, learning railroad.
THE WITNESS: Learning railroad.
Q. Did you ever go out in yards and look at equipment?
A. Yes.
Q. And who took you out there to do that?
A. There were numerous people that I worked with, and I cannot remember all of their names.
Q. Okay. At some point in time, you get sent to Havre, Montana; is that correct?
A. Yes.
Q. It's a great place, isn't it? You don't have to say --
MR. MONTGOMERY: You don't have to answer that. I will instruct you not to answer.
Q. Was this a promotion, going to Havre, Montana?
A. Yes.
Q. Okay. And so you were a terminal trainmaster at

Havre?
A. Yes.
Q. What were your job duties?
A. I worked with yardmasters and train crews regarding trains coming into and out of the terminal.
Q. Did you have any responsibility for safety?
MR. MONTGOMERY: Object to the form.
A. Safety as far as what?
Q. What I am -- I will tell you where I am going with this. At some point in time, you're going to end up being a manager of safety, and I am trying to see what, if any, safety training you got by BNSF prior to becoming manager of safety, okay?
A. (Nodded.)
Q. That's where I am going. So why don't you tell me -- in fact, let's just do it that way. What, if any, training did Burlington Northern Santa Fe give to you regarding safety or accident prevention prior to you becoming a safety manager?
A. Okay. Now that I understand.
Q. Yes. That's where I am trying to go with all of this.
A. Okay. When I accepted the position as manager of safety in Seattle, I was given some training in Fort Worth regarding -- regarding our Safety Action Plan; regarding -- I am trying to think of exactly what-all they taught us, but I can't remember all the specifics of what they taught us.

Page 14

Q. Who was doing the teaching in Fort Worth for safety training for you?
A. Well, there is a Safety Department, and there were multiple people in that department.
Q. Who do you remember?
A. Dan Rourke.
Q. And what's his position?
MR. MONTGOMERY: What was his position at the time?
MR. JUNGBAUER: What was, yes.
A. I don't know his -- I don't know his formal title.
Q. Okay. But he was one of the instructors?
A. Correct.
Q. Okay. And he was in Fort Worth?
A. Yes.
Q. Do you know where he is today?
A. In Fort Worth.
Q. Still?
A. (Nodded.)
Q. Do you know what his job is now?
MR. MONTGOMERY: Assumes facts not in evidence.
MR. JUNGBAUER: I am asking what she knows.
MR. MONTGOMERY: I know. Assumes he has a job now.
MR. JUNGBAUER: Okay.

Page 15

Q. He is in Fort Worth. Is he working for the company?
MR. MONTGOMERY: Foundation.
A. Yes.
Q. Okay. Now we got that. What does he do for the company?
A. He works in safety.
Q. And what does he do in safety?
A. I don't know his title, and I don't know all of his job roles and responsibilities.
Q. Okay. Did he ever give you any written materials in your training for -- regarding safety at BNSF?
A. Dan Rourke?
Q. I could make it easier. Did anyone give you any written materials?
A. And that's what I am trying to remember. You're given, yes, various material, but I don't remember specifically what I was given.
Q. You have seen the Northwest Division Safety Action Plans for different years, I assume?
A. Yes.
Q. Okay. What is a Safety Action Plan?
A. It is a plan that the division uses as our roadmap to various safety functions.
Q. When you were the manager of safety for the Northwest Division, would you assist in putting together the Northwest

Fed. R. Evid. 402-403

Page 16

Fed. R. Evid. 402

Division Safety Action Plan?
A. How so?
Q. Did you do anything? Did you go to meetings? Did you talk to people? Did you help put the program together?
MR. MONTGOMERY: Object to the form.
A. No.
Q. What, if any, function would you have with regard to a Safety Action Plan?
MR. MONTGOMERY: Object to the form.
A. I did the formatting.
Q. What's that?
A. I would make sure that all the fonts was the same size.
Q. For typing it, you mean?
A. Correct.
Q. Okay. Did you write any of the items in the Safety Action Plan?
A. No.
Q. Who did the writing for the Safety Action Plan?
MR. MONTGOMERY: Foundation.
A. Fort Worth.
Q. Okay. So safety people in Fort Worth?
A. Correct.
Q. Did Dan Rourke have any input into the Safety Action Plan?

Page 17

MR. MONTGOMERY: Objection; foundation.
A. I don't know.
Q. Did you ever -- when you were safety manager for the Northwest Division, did you ever talk to anybody in the Safety Department in Fort Worth?
A. Yes.
Q. Who did you talk to down there?
A. I talked to numerous people.
Q. Well, tell me who.
A. I would talk to Dan Rourke.
Q. Okay.
A. I would talk to Gene Welander.
Q. Do you remember what Mr. Welander's position was?
A. No. I do not know his formal title.
Q. Okay. But he is also -- is he still at Fort Worth, also?
MR. MONTGOMERY: Foundation.
A. No.
Q. Did he retire?
A. Yes.
Q. Okay. But did he retire after you left the manager position, or when did he retire?
A. It was during my manager of safety position.
Q. Okay. Do you know who took his place?
A. Eric Weber.

Q. And is Mr. Weber still in Fort Worth?
MR. MONTGOMERY: Foundation.
A. Yes.
Q. Anyone else you talked to down there besides Mr. Rourke, Mr. Welander, and Mr. Weber?
A. Kevin Wilde.
Q. That's one you've got to spell for me. Could you spell that.
A. K-e-v-i-n.
Q. That one, I could figure out.
A. Wilde, W-i-l-d-e.
Q. Okay. Do you know what his position of employment was?
A. I don't know his formal title.
Q. Okay. Anyone else besides Mr. Wilde in Fort Worth that you talked to as -- when you were manager of safety?
A. Gosh, there were a lot of people.
Q. Did they --
A. I can't remember everybody.
Q. Okay. When you were manager of safety, did the company ever call you in to meetings in Fort Worth?
A. Regarding what?
Q. Safety.
A. What part of safety?
Q. Did you ever travel to Fort Worth while you were manager of safety to attend any meetings?

A. Yes.
Q. How often?
A. Once a quarter.
Q. Okay. And what would happen at these quarterly meetings?
A. The quarterly meetings were a -- a safety summit meeting.
Q. All right. Who was at the safety summit?
A. Safety coordinators.
Q. Is that different from the safety manager?
A. Yes.
Q. Okay. Who is the safety coordinator for your territory?
MR. MONTGOMERY: Who was at the time?
Q. Who was at the time?
A. There were four.
Q. And who were they?
A. Steve Brandenburg.
Q. Could you spell that.
A. B-r-a-n-d-e-n-b-e-r-g (sic).
Q. Okay.
A. Terry Reddish.
Q. Spell "Reddish," please.
A. R-e-d-d-i-s-h.

Q. Okay.
A. Greg Gordley.
Q. Would you spell "Gordley."
A. G-o-r-d-l-e-y.
Q. Okay.
A. And Jeff Gion.
Q. Would you spell Jeff's last name.
A. G-i-o-n.
Q. G-i-o-n, okay. Where was Mr. Brandenburg located?
A. (No response.)
Q. I can maybe shorten this up. Are these four so-called safety coordinators union members appointed by a general chairman?
A. Yes, they are.
Q. So they are union guys that are kind of working as liaisons with you?
A. Correct.
Q. Okay. Do you know which general chairman appointed them? Were they different unions or --
A. I do not know.
Q. Okay. Were they paid separately for this position?
MR. MONTGOMERY: Form, foundation.
Q. If you know.
A. I don't know.
Q. Other than the safety coordinators and the safety -- did all the safety managers go to these safety summits?

A. Yes.
Q. And would there be one for each -- how many safety managers were there at that time?
A. One for each division.
Q. And how many divisions do you have -- did you have?
MR. MONTGOMERY: You mean the railroad?
MR. JUNGBAUER: Yes.
A. Thirteen.
Q. Yeah. Okay. And so then who would be in charge of the 13 safety managers at that time?
A. Each safety manager worked with a general manager.
Q. General manager?
A. Correct.
Q. Okay. And would that be an operating person, or is that a general manager of safety?
A. That is a general manager of each division.
Q. Okay. So like in the Northwest Division, who would you have been working with?
A. Doug Jones.
Q. Right. And he is an operations person, correct?
A. I don't know if he is operations. He is over the entire division.
Q. That's what I mean. Okay. So he runs the whole -- he runs the division, correct?

A. Correct.
Q. Okay. And you're the top safety person in the Northwest Division at that time?
MR. MONTGOMERY: Object to the form.
A. I was the manager of safety working with Doug Jones.
Q. Okay. Was there anybody employed by Burlington Northern Santa Fe assigned to the BNSF Northwest Division in the role of safety that's higher than you at that time?
MR. MONTGOMERY: Object to the form.
A. No.
Q. Okay. Did you have anyone from Burlington Northern Santa Fe working for you in the Northwest Division when you were general manager of safety?
A. No.
Q. Okay. What were your job duties as general manager of safety?
A. I was not general manager of safety.
Q. Excuse me. Manager of safety. I apologize. You're right. As manager of safety, what was your -- what were your job duties?
A. I would attend safety meetings and promote the Safety Action Plan.
Q. Okay. Anything else?
A. I would report injuries and incidents to Fort Worth.
Q. Okay. Anything else?

Incomplete No question

A. No.
Q. Okay. I am going to show you -- we will mark this as Exhibit 1.
(Exhibit 1 marked for identification.)
Q. Okay. Showing you what's been marked as Exhibit 1. Could you tell us what that is.
A. It says "BNSF Northwest Division Safety Action Plan 2008."
Q. And so there would be a Safety Action Plan for each calendar year?
A. That is correct.
Q. Okay. And is this the type of plan that you would have promoted, as you describe as part of your job duties as a manager of safety?
A. Yes.
Q. Can I see that, please.
A. (Witness complies.)
MR. MONTGOMERY: Sure be a lot easier if you brought copies for everybody, counselor.
MR. JUNGBAUER: Off the record.
(Discussion off the record.)
MR. JUNGBAUER: Back on the record.
Q. On the first page, it talks about -- of Exhibit -- it's actually page 2 of Exhibit 1. There are safety -- division

Fed. R. Evid. 402

safety goals. Did you have division safety goals when you were safety manager?
MR. MONTGOMERY: Object to the form.
A. Yes.
Q. Okay. And who came up with what the goals were for your -- for the Northwest Division, as far as safety goals?
MR. MONTGOMERY: Objection; foundation.
A. The general manager.
Q. So that would be Doug Jones?
A. Yes.
Q. Okay. And according to page 2 of Exhibit 1, there is a reportable injury frequency ratio 1.65. Do you know what that means?
A. Yes.
Q. Why don't you tell us what that is.
A. It is the number of injuries multiplied by man hours divided by 200,000.
Q. Okay. And that's a ratio of injuries to workman hours that Mr. Jones and your Safety Action Plan was trying to set as a goal?
MR. MONTGOMERY: Objection; foundation.
A. Can you rephrase that question?
Q. Sure. If I am looking at this Northwest Safety Goals, there is three different things listed there. The first one is reportable injury frequency ratio of 1.65. That's one of the

Fed. R. Evid. 402

Incomplete; No answer

goals, correct, for that year?
MR. MONTGOMERY: Object to the form, foundation. And for the record, you're a far cry at this point from whether or not BNSF is liable for her injuries and, if so, what her damages are.
MR. JUNGBAUER: I am sure trying to find out what she does as a safety manager, and then we are going to get there.
MR. MONTGOMERY: It would be delightful to get there.
MR. JUNGBAUER: Huh?
MR. MONTGOMERY: It would be delightful to get there.
MR. JUNGBAUER: Come on, Tom. I have been through 14-hour depositions with you. I am only doing two with her.
MR. MONTGOMERY: Okay.
MR. JUNGBAUER: Okay.
Q. So can you tell -- and then there is a second -- do you see that there is three goals listed here on the second page?
A. Yes.
Q. All right. And would you read what those three goals are for your Safety Action Plan.
A. It states, "Northwest Division Safety Goals,

Fed. R. Evid. 402

Incomplete No question

Fed. R. Evid. 402

Foundation

Fed. R. Evid. 402

reportable injury frequency ratio of 1.65."
Q. Okay. What's the second thing; goal?
A. "Lost workdays/restricted severity ratio, 50."
Q. What's that?
A. It is calculated as the number of days an employee misses work due to an injury, multiplied by man hours, divided by 200,000.
Q. Okay. So is the number -- total number of workdays on that ratio for the year -- is your goal 50 for 2008?
MR. MONTGOMERY: Object to the form, foundation.
A. No.
Q. What was the goal?
A. This is a ratio.
Q. Oh, it's a ratio, okay. And what's the third goal?
MR. MONTGOMERY: Object to the form.
A. "Reduce HF rail equipment incidents by 20 percent."
Q. And what are HF rail incidents?
A. "HF" means human factor.
Q. Uh-huh. That's a "Yes." Okay. And how were you going to go about reducing human factor rail incidents by 20 percent?
MR. MONTGOMERY: Object to the form.
A. In my position, I did not reduce human factor rail incidents.
Q. Okay. Is the plan set out to reduce human factor rail

incidents?
MR. MONTGOMERY: Object to the form, foundation.
A. The plan --
Q. The Safety Action Plan.
A. -- is not reducing human factor incidents.
Q. Isn't one of the three goals to reduce human factor incidents?
A. Yes.
Q. Okay. So how was Burlington Northern Santa Fe going to go about reducing human factor incidents under this Safety Action Plan?
MR. MONTGOMERY: Object to the form, foundation.
A. I am not -- I am not -- I do not understand what you are asking me.
Q. Okay. You were the safety manager for the Northwest Division. What, if anything, did you do to reduce human factor incidents on the railroad?
MR. MONTGOMERY: Object to the form.
A. I would work with leadership teams at different various terminals to help them develop safety plans, actions items (sic) in order to reduce their human factor incidents.
Q. Do you have any formal training in accident prevention?
MR. MONTGOMERY: Object to the form.
A. What do you mean by "formal"?

Fed. R. Evid. 402

Lack of foundation

Q. Do you have any training -- actual courses -- that you have taken in accident prevention?
MR. MONTGOMERY: Same objection.
A. Again my question is: What do you mean by "formal"?
Q. Classroom training with books or materials.
A. Held by?
Q. Anyone. National Safety Council, BNSF, AAR, anybody.
A. I have not attended official training classes held by the National Safety Council --
Q. Okay.
A. -- or the AAR.
Q. And for purposes of the record, "AAR" is what? Association --
A. Association of --
Q. American Railroads?
A. That is correct.
Q. That's an industry association of all the major railroads?
A. Correct.
Q. Including BNSF?
A. Correct.
Q. Okay. Have you attended any formalized accident prevention training by anyone?
MR. MONTGOMERY: Object to the form.
A. No.

Q. Okay. Would you agree, as a safety manager, part of your job duty, to the best of your ability, would be to help to prevent or reduce accidents on the railroad?
MR. MONTGOMERY: Object to the form.
A. Can you ask me that question again?
MR. JUNGBAUER: Would the court reporter read it back, please.
(The last question was read.)
A. Yes.
Q. Okay. Is it true that safety managers are supposed to study accidents to find the root causes of accidents so that accidents can be prevented in the future?
MR. MONTGOMERY: Object to the form, incomplete hypothetical, calls for speculation.
THE WITNESS: Can you read the first part of that question?
(The last question was read.)
A. No.
Q. Okay. Does anyone at Burlington Northern Santa Fe in the Safety Department or any other department do what is called root cause analysis of accidents?
MR. MONTGOMERY: Foundation, form.
A. I do not know.
Q. Do you know what "root cause analysis" is?
MR. MONTGOMERY: Assumes facts not in evidence.

Fed. R. Evid. 402; Foundation

A. I am not sure how you mean "root cause analysis."
Q. Have you ever heard of "job safety analysis"?
A. No.
Q. So is it fair to say that no one taught you, prior to you becoming safety manager for the Northwest Division of Burlington Northern Santa Fe, what "job safety analysis" was?
MR. MONTGOMERY: Assumes facts not in evidence, form.
A. Correct.
Q. Okay. Is it also true, then, that no one taught you, prior to you becoming safety manager at Burlington Northern Northwest Division, what "root cause analysis" is?
MR. MONTGOMERY: Assumes facts not in evidence, form.
A. Correct.
Q. Did anyone teach you at -- prior to becoming safety manager for the Northwest Division at Burlington Northern Santa Fe, how to study and determine whether or not the training that employees such as hostlers are getting is sufficient or insufficient from a safety point of view?
MR. MONTGOMERY: Could you read that back? I am sorry. I don't want to do spurious objections. Can I hear that again?
(The last question was read.)
MR. MONTGOMERY: Thank you. Object to the form.

A. Correct.
Q. Okay. I don't understand what you mean by "correct." So did somebody teach you how to do that; how to --
A. No.
Q. Okay. If no one taught you how to study or determine whether or not the training that hostlers and hostler helpers got, whether it's sufficient enough to do a safe job, then how do you know that it -- that safety is being promoted on your railroad in your territory?
MR. MONTGOMERY: Object to the form. Assumes facts not in evidence. To some extent, argumentative. Go ahead.
A. That was not my job.
Q. Whose job was it from a safety point of view to check and see whether or not the training that hostlers and hostler helpers were getting was sufficient or not?
MR. MONTGOMERY: Objection; foundation, form.
A. I do not know.
Q. And the railroad -- your -- Burlington Northern Santa Fe has reduced the number of train crews over the years. Are you aware of that? They have gone from five people to four to three to two? Have you learned that?
A. On a train?
Q. Yes.
A. The crew that runs the train?

Q. Yes.
A. Yes, I am aware of that.
Q. Okay. From a safety point of view, did anyone ever teach you whether -- what the safety implications of reducing crewmembers are?
MR. MONTGOMERY: Objection; assumes facts not in evidence.
A. No.
Q. As a safety manager, did you ever study to see whether or not there were enough people on crews for everyone to safely do their job?
A. No.
Q. Do you -- as a safety manager in the BNSF Northwest Division, did you do any type of auditing to see whether or not crewmembers -- hostlers and hostler helpers, for instance, or even train crewmembers -- had received enough training so that they would know the radio rules and hand signal rules of GCOR?
MR. MONTGOMERY: Object to the form. Assumes facts not in evidence.
A. No. I did not look at their training.
Q. Okay. Do you know what "GCOR" is?
A. Yes.
Q. What is GCOR?
A. General Code of Operating Rules.
Q. All right. Are you familiar with those rules?

MR. MONTGOMERY: Object to the form.
Q. As a safety manager, were you familiar with those rules?
MR. MONTGOMERY: Object to the form.
A. Yes.
Q. If -- under the GCOR rules, if an employee of BNSF is operating -- a hostler is operating a set of engines, or a consist, and that movement is being directed by a hostler helper by hand signals, if the person that's giving the hand signals goes out-of-sight, what, if anything, does that mean from a safety point of view?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation.
A. That was a very long question with different scenarios in there, so I did not follow the entire --
Q. Okay.
A. -- question.
Q. I will do it again. In fact, I am going to ask you to assume that in Ms. Wallis's situation, that there are three locomotives. And you know that's called a consist if they are put together, correct?
A. Correct.
Q. Have you ever heard that term?
A. (Nodded.)
Q. So we have a consist of three locomotives, and these

locomotives are being moved around in a rail yard by a hostler and a hostler helper. You understand what those terms are?
A. (Nodded.)
MR. MONTGOMERY: Object to the form.
A. Yes.
Q. Okay. Now, if the hostler is operating, or controlling, the locomotives, and the hostler helper is directing the movement by hand signals, and if the hostler helper for some reason cannot see -- if the hostler cannot see the hostler helper who is giving directions, what, under the rules, is the hostler supposed to do, if anything?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation.
A. In that situation, I do not know. There are multiple factors that could have caused -- or be the resultant of a hostler helper -- pardon me. Of the hostler not being able to see the hostler helper.
Q. So from a safety point of view, do you think it's okay for a train to keep moving if the person who is giving hand signals goes out-of-view?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation.
A. I don't believe, in the situation that you presented to me, that I can draw a full educated decision.
Q. Okay. What would -- if anything, would you instruct

your people in the Northwest Division when you were the safety manager when you'd go around and try to teach people about safety, if that question came up -- for instance, if Sue Duff, who is a hostler in your territory, were to have asked you, "Hey, if I am operating an engine, and I am working with Jen Wallis, and she is giving me hand signals, if she goes out-of-view, what are my obligations," would you be able to tell her?
MR. MONTGOMERY: Object to the form, assumes facts not in evidence, calls for speculation, incomplete hypothetical, and argumentative.
A. I do not know Sue Duff, and it was not my responsibility, when I was going around talking about safety, to discuss situations such as this.
Q. Whose responsibility in the Northwest Division was it to go around and talk about safety of those -- of that type of rule of whether to stop a movement or not stop a movement if someone goes out of view? If it's not your responsibility from safety, whose job was it?
MR. MONTGOMERY: Objection; foundation, form.
A. There are --
MR. MONTGOMERY: Assumes facts not in evidence. Sorry. It takes awhile to filter through it all.
A. There are two different departments: Rules and Safety.

Q. Wouldn't you consider the safety of your employees as your job as a safety manager?
MR. MONTGOMERY: Object to the form. Assumes facts --
A. Can you ask --
MR. MONTGOMERY: Go ahead. I am sorry. It means I don't have to object again if you're going to ask him to repeat it or rephrase it.
Q. Are the rules that the company has something just to punish employees, or is it to make the railroad safer, or both?
MR. MONTGOMERY: Object to the form. Assumes facts not in evidence. Certainly is argumentative.
A. The rules are in place not as a punishment.
Q. Okay. Are they there for safety?
MR. MONTGOMERY: Object to the form.
A. They are there as a guideline to instruct employees on how to perform their various job tasks.
Q. From a safety point of view, do you agree with the statement you just made that the safety rules are guidelines for employees?
MR. MONTGOMERY: Object to the form, mischaracterizes her earlier testimony, assumes facts not in evidence, argumentative.
A. They are -- they are safety. Can you ask me that again?

Argumentative; Fed. R. Evid. 402-403; Not testimony

MR. JUNGBAUER: I will ask the court reporter to read it back to you, please.
(The last question was read.)
MR. MONTGOMERY: Same objections.
A. The safety rules are guidelines for employees. The General Code of Operating Rules is a guideline to perform their job tasks.
Q. Are they rules or are they guidelines? Do you know the difference?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical.
A. They are rules.
Q. Okay. So they are not guidelines?
MR. MONTGOMERY: Object to the form.
A. Correct.
Q. All right. Now that we know that they are -- that the GCOR rules are rules and not guidelines, what, if anything, did you as a safety person do to make sure that your employees such as hostlers and hostler helpers understood fully the rules so they could comply with them?
MR. MONTGOMERY: Object to the form. Assumes facts not in evidence.
A. It was not my job to ensure that employees knew and conformed to the GCOR.
Q. Whose job was it?

Page 38

MR. MONTGOMERY: Objection; foundation and asked and answered, as was the previous question.
A. It would be those employees' supervisors.
Q. From an overall safety point of view, if you're trying to reduce the number of accidents, wouldn't you as the overall safety manager for the whole Northwest Division want to make sure that the supervisors who are instructing hostlers, hostler helpers, or train crews are doing so in a good manner to make sure that all the employees fully understand the rules?
MR. MONTGOMERY: Object to the form. Incomplete hypothetical. Answer if you can.
A. It is the employees' supervisor to -- the employees' supervisor's responsibility to ensure that those employees know and understand the rules.
Q. But the Safety Department doesn't monitor to see whether or not the supervisors are doing a good job at that?
MR. MONTGOMERY: Object to the form.
A. No.
Q. What is oversight process in a Safety Action Plan?
MR. MONTGOMERY: Do you want to show it to her; show her the context?
MR. JUNGBAUER: Sure.
Q. Page 6.
MR. MONTGOMERY: Object to the form, and the document speaks for itself. Let's go back. I just want to flip

Page 39

back.
MR. JUNGBAUER: That's stuff about Canada. I didn't ask about that.
MR. MONTGOMERY: Oh. See if -- okay. Same one? This is Exhibit 1?
MR. JUNGBAUER: Yes.
MR. MONTGOMERY: Okay. So you're asking her about Exhibit 6 --
MR. JUNGBAUER: Page 6 of Exhibit 1.
MR. MONTGOMERY: -- even though on page 4 is where the heading starts?
MR. JUNGBAUER: She can go anywhere she wants in the whole exhibit. I want to know about the oversight process in the Safety Action Plan.
MR. MONTGOMERY: All right. I will just object to the form.
A. The oversight process is a section of the Safety Action Plan.
Q. Okay. Well, when you testified earlier that part of your job as a safety manager was to promote the Safety Action Plan, you would also promote oversight, wouldn't you?
A. Oversight of the Safety Action Plan or --
Q. Yes.
A. -- oversight of the oversight process?
Q. Oversight of -- the oversight process of employees.

Page 40

Wouldn't you as promoting the Safety Action Plan be promoting oversight of employees?
MR. MONTGOMERY: Object to the form.
A. No.
Q. Okay. May I see that, please? Have you -- do you know what the Risk Identification Process and Work Practice Observation -- and that's where I was on page 6. Do you know what those two programs were, under the Safety Action Plan?
A. Yes.
Q. What are they?
A. Risk Identification Process and Work Practice Observations are programs in which union employees work with other union employees to identify practices that may be unsafe.
Q. So if a union employee such as my client, Ms. Wallis, were to think there were unsafe practices and were to tell management about that, what is management supposed to do if a union employee tells management there is possible unsafe practices out there?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation.
A. In the situation that you provided me, that does not fall under the guidelines --
Q. Okay.
A. -- of either one of these.
Q. So let's say that an employee such as Ms. Wallis

Page 41

believes that some of the employees in the hostler training program are not getting enough training, and she tells people that. Is there anybody in the Safety Department that would look into that complaint?
MR. MONTGOMERY: Object to the form, foundation, calls for speculation, incomplete hypothetical.
A. It would only come to the Safety Department if we were notified.
Q. By management?
MR. MONTGOMERY: Same objections.
A. Do you mean by her management?
Q. Yes. Well, if Ms. Wallis complains to someone who is one of her bosses, whose job is it to let the Safety Department know of the problem?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation.
A. As I previously stated, there is a Safety Department, and there is a Rules Department. Training and rules falls under the Rules Department, not under the Safety Department. So if Ms. Wallis was to raise a concern, as you stated, to her supervisor, the avenue would not be the Safety Department.
Q. As a safety manager, do you think that you have any ability to listen to complaints of someone such as Ms. Wallis who says, "Hey, I don't think these people are getting enough training" -- hostlers -- or would you say, "Not my job; go talk

to the Rules Department"?
MR. MONTGOMERY: Objection; form, foundation, calls for speculation, incomplete hypothetical, and argumentative.
A. So you're asking me if I have the ability to listen?
Q. Do you have the ability to act, or would you -- is it really not your job to do anything about that if Ms. Wallis or her supervisor were to have said to you, "Hey, here is what happened. We have got a complaint about a possible lack of training, or insufficient training"? Doesn't the Safety Department have any way to say to the Rules Department, "Hey, guys, we want to look into this"?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation.
A. In this completely hypothetical situation, if an employee came to me with a concern regarding training, I would help them get in touch with the Rules Department and the persons who are responsible for training.
Q. Well, you have got a national Safety Department at BNSF, correct?
MR. MONTGOMERY: Object to the form.
Q. I mean, there is systemwide safety people such as Mr. Rourke, Mr. -- all the people down there in Fort Worth?
A. Correct.
Q. Does -- do the people on the system level, the safety

people, actually do any type of safety analysis to see whether the supervisors and managers at BNSF are running a safe railroad or not?
MR. MONTGOMERY: Object to the form, foundation.
A. That was not my job, and I do not know every job task that system safety employees do.
Q. When you went to these quarterly meetings in Fort Worth, did anyone ever say at a quarterly meeting, "Hey, we in the Safety Department are really encouraging better training, better rules compliance out in -- out in the field"? Did anybody ever say that to you?
MR. MONTGOMERY: Object to the form, argumentative.
A. That is really broad.
Q. Okay. Let me ask it a different way. Do you know of any accident prevention program that BNSF had while you were safety manager that would help reduce accidents caused by failure to comply with rules by a hostler?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical.
A. No.
Q. Okay.
MR. MONTGOMERY: Could we take a break soon?
MR. JUNGBAUER: Yes. I will finish this.
Q. Now, you know that -- you used the term earlier "human

Assumes facts not in evidence
Incomplete hypothetical

factor" as types of accidents, or types of causes of accidents, correct?
MR. MONTGOMERY: I believe she was referring to a document. Object to the form.
Q. You're familiar with the term "human factor accidents," correct?
A. Correct.
Q. All right. Isn't it true under federal FRA rules that if the railroad claims an accident is caused by human factors, that the railroad has an obligation to let the employee or employees who the railroad claims caused the human factor accident to notify them in writing so that they can respond under Form 6 -- FRA Form 6180?
MR. MONTGOMERY: Object to the form and foundation.
A. I believe so, but I am -- that's not my job.
Q. Whose job is it at Burlington Northern Santa Fe to let employees know -- an employee or employees know -- that they are being listed with the government as having made -- caused a human factor accident so they can say, "Hey, it wasn't my fault, it was something else"?
MR. MONTGOMERY: Object to the form, foundation, assumes facts not in evidence.
A. That would be the reporting center in Fort Worth.
Q. Okay. So there is someone who is supposed to let the

Fed. R. Evid. 402-403; Foundation; Assumes facts not in evidence

employees know if they are claiming a human factor accident, correct?
MR. MONTGOMERY: Object to the form, foundation, assumes facts not in evidence.
A. This is not my area of expertise.
Q. From a safety point of view, how do you know if an accident is caused by human factors or not?
MR. MONTGOMERY: Object to the form, foundation, assumes facts not in evidence, calls for speculation, and it would be nice to take a break soon.
MR. JUNGBAUER: As soon as she answers this question.
A. Can you ask me that question again?
(The last question was read.)
MR. MONTGOMERY: Same objections, of course.
A. It was not my job to decide whether an accident was caused by human factor.
Q. Who does decide that?
A. Whoever the investigating officer is.
Q. Are you aware that management personnel at BNSF are given bonuses if their accident ratio comes within the goals of the Safety Action Plan or not?
MR. MONTGOMERY: Object to the form, foundation.
Q. It's called an incentive -- ICP bonus. Have you ever heard of that?

Fed. R. Evid. 402

Foundation

Fed. R. Evid. 402-403; Argumentative

Foundation Argumentative; Fed. R. Evid. 402-403; Assumes facts not in evidence

Page 46

MR. MONTGOMERY: Object to the form, foundation, assumes facts not in evidence.
A. You asked me several questions.
Q. Yes. Do you know what an ICP bonus is?
A. Yes.
Q. And isn't part of the ICP bonus based on percentage of reportable accidents and injuries?
MR. MONTGOMERY: Objection; foundation.
A. There is a safety piece.
Q. It's about 15 percent, isn't it?
MR. MONTGOMERY: Objection; foundation.
A. I don't know.
Q. Okay. But there is a component of all managers' bonuses based on personal injuries statistics, correct?
MR. MONTGOMERY: Objection; asked and answered, form, foundation.
A. I believe so.
Q. If you're trying --
MR. JUNGBAUER: Here is what -- and I will try and end after this one, counsel, for a break.
Q. If you're trying to promote safety at BNSF, how do you know that your supervisors and managers are not cooking the books to get a bonus if part of their bonus is based on those statistics?
MR. MONTGOMERY: Object to the form, foundation,

Page 47

incomplete hypothetical, argumentative.
A. I don't know how to answer. How would I as Liz Jackson know that a manager is cooking the books?
Q. No. How would you as Liz Jackson, Safety Manager for the Northwest Division when you were, know whether or not your books are being cooked, as far as accident reporting, if there are financial incentives that affect the bonuses of these supervisors who were filling out these reports?
MR. MONTGOMERY: Object to the form, foundation, asked and answered, assumes facts not in evidence. Did I say "argumentative"? And argumentative. Can we get on --
MR. JUNGBAUER: As soon as she answers the question.
MR. MONTGOMERY: It's not an answerable question.
MR. JUNGBAUER: It is. She can say she knows, she doesn't know, or doesn't care, whatever she wants to say.
A. I don't know how to answer that question.
MR. JUNGBAUER: Okay. We can take a break.
(Short recess.)
MR. JUNGBAUER: Back on the record.
Q. During the break, I had a chance to --
MR. MONTGOMERY: Is this a 15-round match?
MR. JUNGBAUER: I intend to.
MR. MONTGOMERY: Sorry to interrupt.

No testimony Fed. R. Evid. 402-403

Exhibit not Provided

Fed. R. Evid. 402

Argumentative

Page 48

MR. JUNGBAUER: No problem.
Q. During the break, I took a look at Exhibit 1. And on page 9, on the "Oversight Process Continued," it's got a bunch of jobs that a division manager of safety is supposed to do. Do you see those up on top?
MR. MONTGOMERY: I am going to object to the form. Object to the extent that it mischaracterizes the document which speaks for itself.
Q. Okay. So looking at page 9 of Exhibit 1. Would you tell me what the -- first of all, are the items listed under "Division Manager of Safety" some of the jobs that you would have to do under the Safety Action Plan?
A. Yes.
Q. Why don't you read those off for me one-at-a-time, and we will discuss them. What's the first one?
A. "Utilize the 'Operations Testing Division Reporting Tool' in the auditing and certification of the division testing program."
Q. All right. Did you use those to comply with the Safety Action Plan as the division safety manager?
MR. MONTGOMERY: Object to the form.
A. Did I use Operations Testing Division Reporting Tool?
Q. Yeah.
A. Yes, I did.
Q. How did you do it?

Page 49

A. The Division Reporting Tool is a computer program that -- that runs data on officers testing.
Q. Okay. Now, is this testing of the officers or officers' efficiency testing of employees that you're monitoring with this computer program?
A. This is officers' operations testing.
Q. Of employees?
A. Of employees.
Q. Okay. So before, when I was asking you, as part of your safety duties, don't you have to find out if supervisors or officers are testing employees to see if they are complying with the rules, under page 9 here, the very first thing, that would be one of the things you're supposed to monitor, isn't it?
MR. MONTGOMERY: Object to the form.
A. I am to monitor if they did perform their operations testing.
Q. So what you're doing is you're -- as part of your safety job, you're supposed to be seeing if the supervisors are out seeing if employees are -- through operations testing, are following the rules, correct?
MR. MONTGOMERY: Object to the form. For the record, Mr. Jungbauer, again, this is very simple FELA case, whether or not Mr. Wallis was injured by BNSF negligence, and if so, her damages. And I believe this is well afield of that, but go ahead.

MR. JUNGBAUER: I will tell you what I am asking. I am asking whether or not, as manager of safety, part of her job, according to Exhibit 1, was to go check and see whether the supervisors of Sue Duff were doing operations testing on Sue Duff to see if she understood the rules of when she is supposed to stop her engines.

Q. That's what I am asking you. Isn't that your job under that?

MR. MONTGOMERY: Boy. Object to the form.

MR. JUNGBAUER: That's about as straight as I can make it, Tom.

MR. MONTGOMERY: Incomplete hypothetical. You can save a lot of time at these deps by just getting to it.

MR. JUNGBAUER: That's right to it. That's right there.

MR. MONTGOMERY: There you go.

Q. Do you understand my question?

A. I understand your question. However, my job was to use the Division Reporting Tool in order to pull this information together. It is not to verify the quality of operations testing. That is the job of those officers supervising. Not mine.

Q. As a safety manager, do you know one way or the other whether or not, from the monitoring that you did, whether or not a hostler such as Sue Duff was ever tested to see whether she

understood that if an employee giving hand signals to her on moving locomotives disappears from sight, whether that's an absolute stop under GCOR or not?

MR. MONTGOMERY: Object to the form, incomplete hypothetical; to some extent, calls for speculation.

A. That was not my job.

MR. MONTGOMERY: Foundation.

Q. And so even though somebody says on this computer program, "Hey, we did operations testing," do you know what rule or rules they were testing on? Can you check that out to see if they ever checked on this stop-when-someone-disappears-from-sight rule?

MR. MONTGOMERY: You're going to have to hear this question read back again, I am sorry, what he is telling you.

Q. All right. I am going to show you GCOR. You're supposed to know that, right?

MR. MONTGOMERY: Object to the form.

Q. It's part of your job to know GCOR, correct?

MR. MONTGOMERY: Object to the form. Which job?

Q. Any job at -- that you have had, either as safety manager or your current job, you have to know GCOR, correct?

A. When I -- yes.

Q. All right. And I am going to show you Rule 5.3.3, "Signal Disappearance." Would you read that out loud, please.

A. 5.3.3, "Signal Disappearance," states, "If a person disappears who is giving the signal to back or shove a train engine or car or the light being used disappears, the employee must stop movement unless employee on leading car controls the air brakes."

Q. Okay. And that's -- you have to know that rule among other rules, correct?

MR. MONTGOMERY: Object to the form. I will point out this is a 2010 edition of the GCOR, but go ahead and answer.

Q. That rule is the same rule back in -- at the time you were safety manager, too, wasn't it?

MR. MONTGOMERY: Objection; foundation.

A. (No response.)

Q. Hasn't that always been the rule as long as you've been taught, that if a person giving hand signals disappears from view, that that's a stop?

MR. MONTGOMERY: Objection; foundation, form.

A. As far as to my knowledge, this is the rule in the GCOR, and I believe it was the same in -- or, during my tenure as a manager of safety.

Q. As a manager of safety, did you do anything ever to check whether or not employees that were operating locomotives complied with that rule?

A. No.

MR. MONTGOMERY: Give me a second. Continue pausing, please. I would have interjected an objection there.

Q. As manager of safety, did you ever do any checking to see if supervisors who did operations testing or efficiency testing of employees checked it to see if Rule 5.3.3 was being complied with?

A. Can you restate that?

Q. Yes. Did you do anything as manager of safety to check to see if the supervisors who were doing testing of employees ever tested their employees on Rule 5.3.3?

MR. MONTGOMERY: Asked and answered.

A. No.

Q. Can I see both of those again?

A. Uh-huh.

Q. The second duty of the division manager of safety on page 9 of Exhibit 1; would you read that out loud, please.

A. No. 2 states, "Provide a monthly OPT certification report to the Regional Vice President, Division General Manager, Senior Manager Field Safety. This certification report will include items listed in the Management Instructions and LOL monthly certification."

Q. What is that? I don't know what those letters stand for.

A. What is what?

Q. Tell me what you're providing.

MR. MONTGOMERY: Object to the form.
A. "OPT" stands for operations testing.
Q. Okay.
A. Monthly, I would provide to those leaders a report that -- that summarizes all of the operations testing data for that month.
Q. Okay. So you'd write a report to even one of the vice presidents of the railroad?
A. Yes.
Q. And you'd monthly tell that vice president about the types of testing of employees, operations testing that's going on?
A. It was in a summarized form. So I would perform -- I would provide summary information of operations tests that were completed for the previous month.
Q. What would be in this summary that you would write?
A. It was -- it was -- it was general information about how many tests had been provided; how many failures there had been.
Q. Were there quotas ever in some areas where you got to do a certain number of tests, and you've got to have a certain number of failures?
MR. MONTGOMERY: Object to the form, foundation; to some extent, argumentative.
A. There are two different questions --

Q. Yes.
A. -- in that question.
Q. Are there quotas, to your knowledge?
MR. MONTGOMERY: Object to the form.
Q. Have there ever been quotas used for this type of testing?
MR. MONTGOMERY: Object to the form. And again, for the record, you're so far afield of a very simple FELA case.
A. There were no quotas on failure rates.
Q. Have you ever heard of a team from Texas coming in and auditing someone in the Northwest Division because there weren't enough failures?
A. No.
Q. It's never happened?
MR. MONTGOMERY: Objection. That's a different question. Objection; foundation and form and argumentative.
A. To my knowledge, no one from Fort Worth was called out to verify testing data.
Q. Has someone been called out from anywhere else to verify testing data in the Northwest Division?
MR. MONTGOMERY: Form and foundation.
A. Not to my knowledge.
Q. Okay. Can I see the form again, please?
A. Uh-huh.
Q. Number 3; would you read that, what your job duties

also included.
A. "Provide training, maintenance and support for superintendents and middle managers in the reporting and measurement process of the respective testing programs."
Q. Did you provide any training to these middle managers on how to do testing?
MR. MONTGOMERY: You're talking about ops testing?
MR. JUNGBAUER: Yes.
A. No, I did not -- I did not provide training for superintendents and middle managers regarding operations testing. However, I did, as No. 3 states, provide training, maintenance and support in the reporting and measurement process of the respective testing programs.
Q. Okay. How did you measure their testing? How did you train them to do that?
A. In this context in No. 3, reporting and measurement process is in regards to using the computer program to enter their ops testing.
Q. So again, they can tell -- are they just telling you they have done a certain number of tests, or are you qualitatively looking at if they are doing the tests correctly or not? Do you -- as a safety manager, do you have any idea if these people that were doing their operations testings were correctly doing the testing?

MR. MONTGOMERY: Object to the form, asked and answered.
A. As I previously stated, I summarize the information. I did not oversee the quality of the operations testing.
Q. Okay. Can I see the sheet?
A. (Witness complies.)
Q. Number 4.
A. Number 4 states, "Assist in the production and analysis of all 72 hour reports, corrective action plans, and the monthly Management Oversight Certification Program."
Q. What did you do to comply with that?
A. That is very broad. You mean in respect to --
Q. Analysis. How did you analyze accidents?
A. Number --
MR. MONTGOMERY: Object; assumes facts not in evidence, form. Go ahead.
A. Number 4 states that I would assist in the production and analysis of all 72 hour reports.
Q. Okay.
A. That is not accidents.
Q. Okay. What's a 72 hour report?
A. A 72 hour report is a report generated by the officer when a specific incident occurs, in regards to rail equipment incidents.
Q. Does it have anything to do with personal injury

Fed. R. Evid. 402

Fed. R. Evid. 402

reporting?
A. No.
Q. If a locomotive -- or, three locomotives strike another locomotive, isn't that supposed to be reported on the 72 hour report?
MR. MONTGOMERY: Object to the form, foundation.
Q. That's equipment striking equipment.
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical.
A. No. That would not cause a 72 hour report to be generated.
Q. Why not?
MR. MONTGOMERY: Object to the form.
Q. Excuse me. What's the criteria for a 72 hour report to be generated?
MR. MONTGOMERY: Object to the form.
A. A 72 hour report would be generated if there was a -- a significant human factor incident such as a main line authority violation or a eight-deadly violation.
Q. A what?
A. Eight-deadly violation.
Q. Like the eight deadly sins? What's "eight-deadly"?
MR. MONTGOMERY: "Eight" space "deadly," I believe.
Q. Eight deadly? You mean like someone --

Fed. R. Evid. 402

MR. MONTGOMERY: Eight -- eight deadly. Eight deadly.
Q. All right. So if you have got a main line authority violation or a deadly, like someone getting killed? Is that what you said?
A. No. "Eight" as in the letter -- or, as in the number "eight" --
Q. Number "eight"?
A. -- deadly.
Q. What is a number "eight" deadly violation?
A. There are eight -- eight --
MR. MONTGOMERY: Go ahead. And by the way, what this has to do with Ms. Wallis's --
MR. JUNGBAUER: I will show you in a second. I am getting there.
Q. Come on.
MR. MONTGOMERY: Please do.
A. There are eight deadly rules violations that are considered significant rules violations.
Q. What are they?
A. Riding equipment to a joint. Shoving. On and off equipment. Running in the performance of duties. Foul of tracks. And I can't remember the other three right now.
Q. So there is three more eight-deadly violations, and even though you were the manager of safety, you can't remember

Fed. R. Evid. 402

Argumentative

them?
MR. MONTGOMERY: Object to the form, argumentative. Is it --
MR. JUNGBAUER: I am just verifying that the manager of safety doesn't know the eight most significant violations there are.
Q. You only know five of them, right?
MR. MONTGOMERY: Object to the form, asked and answered, argumentative.
A. At this time, I cannot remember the other three.
Q. Okay. Well, let's talk about the ones you do remember. Riding equipment to a joint; what does that mean?
A. It means that if an employee was riding the side of a boxcar, that they cannot couple into other equipment while they are riding the side of that boxcar.
Q. Okay. And if there was -- if you had knowledge -- and does that also apply to riding engines? That you don't ride on the side of an engine when -- to actually couple onto another engine? That that's a violation?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation.
Q. You said "riding equipment." Doesn't that include a locomotive?
MR. MONTGOMERY: Same objections.
A. Yes. A locomotive is a piece of equipment.

Fed. R. Evid. 402

Argumentative

Incomplete hypothetical

Calls for speculation

Argumentative

Q. Okay. So if Ms. Wallis was on a locomotive, and she is riding that locomotive, and for some reason, the person that's running those locomotives decides not to stop the locomotives before coupling onto another locomotive, she has got to get off that locomotive, right?
MR. MONTGOMERY: Object to the form, foundation, calls for speculation, incomplete hypothetical.
A. If -- if an employee was riding the side of a locomotive -- in our made-up scenario, if an employee was riding the side of a locomotive, yes, they should stop the locomotive, dismount, and make the coupling.
Q. Okay. Because they are not allowed to ride the locomotive to the coupling, correct?
MR. MONTGOMERY: Object to the form, incomplete hypothetical, calls for speculation.
A. With the circumstances that I am presented, that is correct.
Q. Okay.
A. But there are other circumstances.
Q. Well, here is one of the questions I have got for you. If you're supposed to investigate eight deadly rules, and Ms. Wallis's accident involves riding the side of a locomotive that collides with another locomotive in coupling and she gets off, doesn't that sound like facts that you should investigate as one of the potential eight-deadly rule violations maybe by

Page 62

the hostler --
MR. MONTGOMERY: Objection.
Q. -- for not stopping the train?
MR. MONTGOMERY: Object to the form, foundation, assumes facts not in evidence, incomplete hypothetical, calls for speculation.
A. It was not my job as manager of safety to investigate an eight-deadly.
Q. All right. Did you do a 72 hour rule follow-up as required by Exhibit 1 for Ms. Wallis's accident, yes or no?
A. Exhibit --
MR. MONTGOMERY: Hang on. Thank you. I think your answer will cover my objection, but object to the form, and assumes facts not in evidence, mischaracterizes prior testimony, and the document speaks for itself. Go ahead.
THE WITNESS: Sorry. Can you repeat the question.
(The last question was read.)
A. No. I am not required to do a 72 hour report. Exhibit 1 states that I will assist in the production and analysis of all 72 hour reports.
Q. Okay.
A. Not complete them.
Q. Did you assist in the analysis of the report regarding Ms. Wallis's accident as required by Rule 1 since riding on

No question

Fed. R. Evid. 402-403

Page 63

equipment was involved, one of the eight deadly rules?
MR. MONTGOMERY: Object to the form. Assumes facts not in evidence.
A. I would analyze these reports, not the incident.
Q. Did you analyze the report in Ms. Wallis's accident?
MR. MONTGOMERY: Objection; assumes facts not in evidence.
A. I would analyze the report for completeness; for completeness and corrective action, follow-up, et cetera.
Q. Did you do that with regard to Ms. Wallis's situation?
A. Yes.
Q. Okay. And what did you -- did you conclude that any corrective action needed to be taken, after analyzing that accident?
MR. MONTGOMERY: Objection to form. Assumes facts not in evidence.
A. Actually, I need to state something. I -- I can't remember if there was a 72 hour report generated on specifically Jeanette Wallis's case because as I previously stated, injuries were not a -- a triggering event for a 72 hour report.
Q. Okay. But one of the -- the first thing you said, the eight-deadly rules violations are triggering events, correct?
A. If -- if those "eight-deadly's" are discovered by an outside test team such as the test team you referred to earlier from Fort Worth, if they discovered that without an officer

Assumes facts not in evidence

Fed. R. Evid. 402; Foundation; Assumes facts not in evidence

Fed. R. Evid. 402; Foundation; Assumes facts not in evidence

Page 64

present, then it would trigger a 72 hour report.
Q. What's the second -- the second thing you talked about, the eight deadly rules? What's this about shoving? What does shoving have to do with an eight-deadly rules violation?
MR. MONTGOMERY: Object to the extent it mischaracterizes earlier testimony, form.
A. Shoving is one of the eight-deadly rules violations.
Q. Shoving, itself, is okay to do; it just has to be done in a correct manner, correct?
A. That is correct.
Q. All right. So if the locomotive consist is shoving, wouldn't that also be a potential triggering event that would cause a 72 hour review in Ms. Wallis's case?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical.
A. I am not familiar with Mrs. Wallis's case and whether the locomotives were shoving or how they were being moved, so I --
Q. If the locomotives were being shoved, wouldn't that be a potential triggering event for a 72 hour safety review?
MR. MONTGOMERY: Object to the form, calls for speculation, incomplete hypothetical, assumes facts not in evidence. Strike that last objection. I am sorry.
A. I do not know if the locomotives were being shoved.
Q. I am asking -- okay. In any situation, whether it's

Fed. R. Evid. 402; Foundation

Page 65

Ms. Wallis's case or not, if you have got three locomotives in a consist, and if the locomotives are being shoved -- not pulling, shoving -- that would be a potential triggering event if an accident occurs, under the 72 hour reporting rule, correct?
MR. MONTGOMERY: Object to the form, calls for speculation, incomplete hypothetical.
A. Moving locomotives in a reverse move is not a shoving move. That is a reverse movement.
Q. What is -- does it depend which direction you're going from the point of view of the hostler in control or engineer in control? And are you referring to main line movements or yard movements when you're saying that, do you know?
A. Sir, you have given me so many different scenarios, examples, movements, and I am not sure exactly what you are looking -- I -- I am not sure exactly what you're looking for.
Q. Here is my problem. You were the manager of safety for the whole Northwest Division. And all of these employees -- the hostlers, the hostler helpers, the conductors and engineers -- they have to know all these rules just like you do off the top of their head. In fact, you're supposed to -- you're on-duty right now, technically, correct?
MR. MONTGOMERY: I move to strike the prior as argumentative; something of a diatribe given the total tenor of your voice.
MR. JUNGBAUER: Oh, come on. I am being very

Page 66

calm here. You know that, Tom.
MR. MONTGOMERY: You are being relatively calm, but your voice inflexion is noted -- notable.
Q. Are you on-duty right now, technically?
MR. MONTGOMERY: Object to the form.
A. Yes.
Q. Okay. You're supposed to have your GCOR and rule books available at all times when you're on-duty, technically, right?
MR. MONTGOMERY: Objection to the form, and argumentative.
A. I am not a train engine or yardman employee.
Q. Are you, under the rules, supposed to have your rule books available when you're on-duty?
A. As I stated, I am not a train engineman or yardman.
Q. I am going to show you Rule 1.3.1 and ask you to read whether that applies only to train departments. I'll circle that for you. Please read that out loud.
MR. MONTGOMERY: Where are we?
MR. JUNGBAUER: The little bracketed part there.
A. Rule 1.3.1?
Q. Yeah. The part I have got the little bracket around there.
A. "General Code of Operating Rules. Employees governed by these rules must have a current copy they can refer to while

Page 67

on duty."
Q. Okay. You're governed by those rules, correct?
MR. MONTGOMERY: Object to the form. Hold on. I am going to keep hold of it so that she can have a current copy that she can refer to while on-duty. Go ahead. Mr. Jungbauer, if you find this area refreshing and fruitful, great.
MR. JUNGBAUER: The reason it is refreshing and fruitful is, look, my client and other employees are judged all the time by rules that the manager of safety doesn't even know, and she is supposed to know them. That -- I find that unfair.
MR. MONTGOMERY: Ask the question --
Q. Do you know --
MR. MONTGOMERY: -- all you want. You can ask me about the rules, but that's just preposterous. Move on.
Q. Do you -- isn't it true that you're supposed to have the General Code of Rules -- of Operating Rules available if needed while on-duty, according to that rule?
A. In my opinion, I am a supervisor in an office setting here for a deposition on a case that I know very little about, and I am not moving trains, equipment, nor am I required to get any main line authority, et cetera, that would make any rule in this book applicable to what I am doing right now. So no, I do not need the General Code of Operating Rules with me right now.
MR. MONTGOMERY: That said, she has it right

Page 68

here, so please move on.
Q. My point -- okay. One of the other things that you said is a triggering event for a 72 hour report is violation of main line authority, correct?
A. That is correct.
Q. So if Ms. Sue Duff, after the accident involving my client, Ms. Wallis, happens to take a locomotive out onto the main line and violate main line authority, that would be something that should have a 72 hour rule, wouldn't it?
MR. MONTGOMERY: Object to the --
Q. A rule -- 72 hour reporting?
MR. MONTGOMERY: Object to the form, foundation, incomplete hypothetical, calls for speculation, assumes facts not in evidence.
A. So what are you -- what are you asking me?
Q. I am asking this: If you as the safety manager were to have learned that Sue Duff or any other employee violated main line authority by taking a locomotive out onto the main line when they are not -- without proper authority, that incident should have triggered a 72 hour report, correct?
MR. MONTGOMERY: Object to the form, calls for speculation, incomplete hypothetical.
A. That is correct.
Q. Did you ever do an analysis of a 72 hour report regarding Sue Duff taking a locomotive out onto the main line

Assumes facts not in evidence

Incomplete hypothetical

Fed. R. Evid. 402

Page 69

without proper authority?
A. Not that I can remember.
Q. If Ms. Duff had or any other employee had, when you were manager of safety, taken a locomotive out onto -- without authority onto the main line, what type of analysis would you do to make sure that never happens again?
MR. MONTGOMERY: Object to the form, incomplete hypothetical, calls for speculation, assumes facts not in evidence.
A. My analysis was in regards to the actual physical report, not to the incident, nor making sure that the incident was not to occur again.
MR. MONTGOMERY: Did I say "asked and answered"? If I missed it, I should have. Sorry.
Q. Who in the Safety Department, if anyone, tries to determine when serious breaches occur such as violating main line authority? Doesn't anybody go back and see, was this person trained enough? Did he or she know the rules well enough so that it doesn't happen again? Does anybody ever do that in the Safety Department?
MR. MONTGOMERY: Object to the form, incomplete hypothetical, calls for speculation, asked and answered.
A. Can you -- can you ask me that again?
Q. Yes. I will try to ask it a different way.
A. Thank you.

Q. To your knowledge, does anyone in the Safety Department go out and check after a rule violation such as taking an engine out onto main line without proper authority -- and you agree that's a very serious offense, especially if Amtrak and the Metro line -- what do you call it? The Sounder, are running through that kind of track? That would be a very serious offense, wouldn't it?
MR. MONTGOMERY: Object to the form, calls for speculation.
Q. Endangering public lives?
MR. MONTGOMERY: Object to the form.
A. "Yes" to that question. And the question, "Yes," that is a very significant event. Taking equipment out on the main line without authority is a significant event.
Q. All right. It's one of the most significant events that can be analyzed, correct?
MR. MONTGOMERY: Object to the form.
A. It is a very significant event that can be observed.
Q. All right. Well, if it occurs, since it is such a significant event, wouldn't -- is there anyone in the Safety Department that would go back and look at the training and rules compliance and testing on that individual to see if there is something wrong with the training program or there is something wrong with the individual that caused that serious event?
MR. MONTGOMERY: Object to the form, incomplete

Compound

Assumes facts not in evidence

Fed. R. Evid. 402

Incomplete hypothetical

Calls for speculation

hypothetical, calls for speculation, asked and answered.
A. I can answer the question in regards to my position, but I cannot answer it for the rest of the Safety Department.
Q. All right. So as manager of safety for the Northwest Division, if such an event occurs in your territory, be it a main line violation or a violation of one of the eight-deadly rules violations, do you as manager of safety ever look in to see whether the person who committed those violations was properly trained?
MR. MONTGOMERY: Object to the form, asked and answered, incomplete hypothetical.
A. No.
Q. Okay. Another question for you. You are aware, aren't you, that there are speed limits of safe coupling for equipment in rail yards?
MR. MONTGOMERY: Object to the form. It assumes facts not in evidence.
A. If you mean correct speeds in which cars can be kicked and coupled, yes.
Q. Yes. Okay. If an engineer or a hostler in a locomotive is shoving equipment to a joint, and a joint is supposed to, under the rules, be made at less than four miles an hour, or four miles an hour or less, would you agree to that?
MR. MONTGOMERY: Object to the form.
Q. Do you need the rule?

Incomplete hypothetical

No question Fed. R. Evid. 402

Assumes facts not in evidence

A. No, I do not need the rule, but can you --
Q. Yes. Are you aware of a rule that says that coupling should be made at four miles an hour or less?
A. Yes.
Q. Okay. So how does a locomotive engineer --
MR. MONTGOMERY: I think it says no more than four -- sorry, sorry. I would have objected to foundation. Didn't need to. But with that objection --
MR. JUNGBAUER: I think that sounded right, four or less.
MR. MONTGOMERY: I'm not sure. That's why I am saying.
Q. It's four miles an hour or less, correct? Is that your understanding?
MR. MONTGOMERY: It doesn't matter.
MR. JUNGBAUER: All right. Well, okay. If you're saying it doesn't matter, counsel, I will move on.
Q. Here is my question. For whatever the speed is for safe coupling, be it four miles an hour or less, or whatever the speed is, how would you expect your locomotive engineer or hostler to gauge the speed that the engine is being shoved at?
MR. MONTGOMERY: Object to the form, foundation, calls for speculation, incomplete hypothetical.
A. You're asking me how I would expect a hostler to know?
Q. Yeah. How are they supposed to know what speed they

Fed. R. Evid. 402

are going?
MR. MONTGOMERY: Object to the form, calls for speculation, incomplete hypothetical.
Q. Do you know?
A. If the hostler was on the locomotive, they can utilize the speedometer.
Q. Okay. Would you agree that's the safest and most accurate way to gauge speed --
MR. MONTGOMERY: Objection --
Q. -- in a locomotive, for a hostler or a locomotive engineer?
MR. MONTGOMERY: What's the question? What's the safest and --
MR. JUNGBAUER: Most -- what did I say?
(The last question was read.)
A. I do not know if I can make that conclusion. I have never been a locomotive engineer. And as a manager of safety, that was not my position.
Q. As a manager of safety, you want trains to couple at safe speeds to comply with the rules as a general safety concept. Would you agree with that?
MR. MONTGOMERY: Object to the form.
A. Yes.
Q. Okay. How would you want your employees to take the safest course engaging their speed of their locomotive?

MR. MONTGOMERY: Object to the form, incomplete hypothetical, calls for speculation.
A. Yes.
Q. Okay. So if a locomotive engineer or a hostler has a speedometer available to him or her to gauge speed, and we agree that that's the most accurate way of gauging speed, would you expect that person, in trying to comply with speed limits, to use the speedometer or just look out the window and count ties or try to guesstimate the speed of the train?
MR. MONTGOMERY: Object to the form, incomplete hypothetical, calls for speculation, mischaracterizes earlier testimony, a little argumentative, asked and answered.
A. I believe you're asking me a question that I cannot answer, given my position and experience.
Q. All right. But as safety manager for the whole Northwest Division, you would want your employees to take the safest -- safe course if there is different options; if you've got a speedometer to look at. If there is nothing else to measure the speed at, would you want that person to at least glance at the speedometer once in awhile; see if they are in compliance with the rules?
MR. MONTGOMERY: Object to the form, assumes facts not in evidence, incomplete hypothetical, foundation.
A. It is not my job -- or, it was not my job as manager of safety to make a judgment decision for an employee on what

they deem as a safe course or not.
Q. Okay. Well, who -- doesn't the Safety Department do the analysis and testing and research to determine what is or is not safe or recommended for employees?
MR. MONTGOMERY: Object to the form, foundation.
A. I did the analysis and research and pulling of data on operations testing but not --
THE WITNESS: Pardon me. Can you repeat his question.
(The last question was read.)
A. I can speak to the manager of safety position. I cannot speak to the Safety Department.
Q. Okay. So again, for the whole Safety Department, in all the training that you have seen and the meetings you have been to, no one's ever talked about accident prevention from the Safety Department in a situation like this; is that correct?
MR. MONTGOMERY: Object to the form.
A. I don't understand your question.
Q. When you drive -- you drive a car, correct?
A. Yes.
Q. If you drive down the road, and you're trying to comply with the speed limit, do you use your speedometer or just look out the window and try to guesstimate how fast you're going?
A. I use my speedometer.

Q. Wouldn't you expect, common sense, for an engineer to use the speedometer in his or her locomotive as opposed just looking out the window and guessing on the speed?
MR. MONTGOMERY: Object to the form, asked and answered, calls for speculation, incomplete hypothetical.
A. As I stated before, I have not been a locomotive engineer, nor was it my position to make a judgment call on whether or not -- or, how that engineer operated that locomotive and what they felt was a safe speed.
MR. JUNGBAUER: Off the record a second.
(Short recess.)
MR. JUNGBAUER: Back on the record.
Q. According to the safety rules in GCOR, when train movements are being directed by hand signals, if the last signal given to a hostler in control of a locomotive or an engineer is three car lengths and no other signal is received, what is the obligation of the person operating the locomotive?
MR. MONTGOMERY: Objection; incomplete hypothetical.
A. With the information that you have given me would be to stop within half that car count.
Q. Okay. And finally, during the time you were safety manager of the Northwest Division, how was the Northwest Division rated for injury performance compared to the other 12 divisions? There are published numbers on that each year,

Fed. R. Evid. 402-403

aren't there?
A. Would you like me to answer both of those questions, or those statements?
Q. Is it true you were bottom or second to the bottom of the whole pack?
A. I cannot remember the exact number --
Q. What do you remember?
A. -- ranking we were.
Q. What do you remember?
A. I know that we were -- we had higher injury frequency ratios than other divisions, but I do not remember what ranking we were.
Q. Wouldn't that be important to you to know if you were at the bottom or second to the bottom of the whole system of BNSF?
MR. MONTGOMERY: Objection; argumentative, assumes facts not in evidence.
A. (No response.)
Q. Let me put it this way. Didn't Doug Jones complain to you while being at the bottom or second to the bottom of the whole system?
MR. MONTGOMERY: Objection; assumes facts not in evidence.
A. No.
MR. JUNGBAUER: I have no further questions.

Argumentative

Assumes facts not in evidence

MR. MONTGOMERY: I have no questions.

(The deposition was concluded, adjourning at 11:13 a.m.)

(Signature was reserved.)

CERTIFICATE

STATE OF WASHINGTON )
) ss
COUNTY OF PIERCE )

I, the undersigned officer of the Court, under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter transcribed under my direction;

That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions, and exceptions of counsel made and taken at the time of the foregoing examination;

That I am neither attorney for, nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 7th of June 2010.

Lori K. Haworth
NOTARY PUBLIC in and for the State of Washington, residing at Gig Harbor.
My commission expires 1/19/14.

STARKOVICH REPORTING SERVICES
(206) 323-0919

AFFIDAVIT

STATE OF WASHINGTON )
) ss.
COUNTY OF PIERCE )

I have read my within deposition, and the same is true and correct, save and except for changes and/or corrections, if any, as indicated by me on the "CORRECTIONS" flyleaf page hereof.

______________________
ELIZABETH ANN JACKSON

SUBSCRIBED AND SWORN to before me this ________ day of __________________, 2010.

______________________
NOTARY PUBLIC in and for the State of Washington, residing at ___________.
My commission expires
______________________.

STARKOVICH REPORTING SERVICES
(206) 323-0919

STARKOVICH REPORTING SERVICES
P.O. BOX 22884
SEATTLE, WASHINGTON 98122
206.323.0919/Fax: 206.328.0632
StarRptSrv@aol.com
June 7, 2010

To: Tom Montgomery
Montgomery Scarp MacDougall, PLLC
Seattle Tower, 27th Floor
1218 Third Avenue
Seattle, Washington 98101

Re: Wallis V. BNSF Railway Company
Deposition of: Elizabeth Ann Jackson
Date Taken: May 20, 2010
Cause No.: 2:08-CV-1711

PLEASE TAKE NOTICE THAT:

Enclosed are two forms: "Affidavit" and a "Correction Sheet." Instruct the deponent to review the deposition, record any corrections over his signature on the Correction Sheet, and sign the Affidavit before a Notary Public. If there are corrections, please furnish other counsel with copies. Return both forms to this office for their inclusion in the original transcript. The transcript will be forwarded to the appropriate party

______________________.

Thank you for your assistance in obtaining signature.

By: Lori K. Haworth, RPR, CCR

cc: William G. Jungbauer

STARKOVICH REPORTING SERVICES
(206) 323-0919